CALDWELL LESLIE & PROCTOR, PC
CHRISTOPHER G. CALDWELL, SBN 106790
Email:  caldwell@caldwell-leslie.com
ANDREW ESBENSHADE, SBN 202301
Email:  esbenshade@caldwell-leslie.com
ALISON MACKENZIE, SBN 242280
Email:  mackenzie@caldwell-leslie.com
1000 Wilshire Blvd., Suite 600
Los Angeles, California  90017-2463
Telephone (213) 629-9040
Facsimile (213) 629-9022

Attorneys for Defendants WARNER BROS. PICTURES
INC. (erroneously sued as WARNER BROS. PICTURES,
LLC); THUNDER ROAD FILM PRODUCTIONS, INC.;
LEGENDARY PICTURES FILMS, LLC; WONDERLAND
SOUND AND VISION, INC.; CORY HELMS; JAMIE
LINDEN; MARY VIOLA; BASIL IWANYK; and
JOSEPH McGINTY NICHOL

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DEBORAH NOVAK, an individual, JOHN WITEK, an individual and WITEK & NOVAK, INC., <br><br> Plaintiffs, <br><br> v. <br><br> WARNER BROS. PICTURES, LLC, a Delaware Limited Liability Corporation, THUNDER ROAD FILM PRODUCTIONS, INC., a California Corporation, LEGENDARY PICTURES FILMS, LLC, a Delaware Limited Liability Corporation, WONDERLAND SOUND AND VISION, INC., a California Corporation, CORY HELMS, an individual, JAMIE LINDEN, an individual, MARY VIOLA, an individual, BASIL IWANYK, an individual, McG aka JOSEPH MCGINTY NICHOL, an individual, and DOES 1 through 10, <br><br> Defendants. | CASE NO. CV 07-4000-GAF (PLAx) <br><br> The Honorable Gary A. Feess <br><br> **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS DEBORAH NOVAK, JOHN WITEK AND WITEK & NOVAK, INC.'S FIRST AMENDED COMPLAINT** <br><br> **F.R.C.P. 56** <br><br> **[Declarations of Andrew Esbenshade, Mark Rose, Jack Lengyel and William Dawson, and Exhibits Thereto, and Separate Statement of Uncontroverted Facts and Conclusions of Law filed herewith]** <br><br> **Date:         August 25, 2008** <br> **Time:         9:30 a.m.** <br> **Place:        Ctrm. 740** |

CALDWELL
LESLIE &
PROCTOR

MSJ 7.29.08

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CALDWELL
LESLIE &
PROCTOR

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD, PLEASE TAKE NOTICE that on August 25, 2008 at 9:30 a.m., at the United States District Court, located at 255 East Temple Street, Los Angeles, California, in Courtroom 740, the Honorable Gary A. Feess presiding, Defendants Warner Bros. Pictures Inc. (erroneously sued as Warner Bros. Pictures, LLC), Thunder Road Film Productions, Inc., Legendary Pictures Films, LLC, Wonderland Sound and Vision, Inc., Cory Helms, Jamie Linden, Mary Viola, Basil Iwanyk, and Joseph McGinty Nichol will and hereby do move pursuant to Federal Rule of Civil Procedure 56(a), for summary judgment on Plaintiffs' First Amended Complaint ("FAC") in its entirety or, in the alternative, for summary judgment on each of the claims for relief in Plaintiffs' FAC.

This motion is brought pursuant to Federal Rule of Civil Procedure 56 on the following grounds:

1.       Plaintiffs' claim for copyright infringement fails because Plaintiffs have failed to adduce sufficient evidence of substantial similarity of copyright-protected material between their documentary and Defendants' film to create a genuine issue of material fact on the claim

2.       Plaintiffs' claim for breach of implied-in-fact contract fails because Plaintiffs have failed to adduce sufficient evidence that they entered into an implied-in-fact contract with any Defendant or that any such contract was breached so as to create a genuine issue of material fact on the claim;

3.       Plaintiffs' claim for breach of written contract fails because Plaintiffs have failed to adduce sufficient evidence that they entered into a written contract with any Defendant so as to create a genuine issue of material fact on the claim;

4.       Plaintiffs' claim for breach of oral contract fails because Plaintiffs have failed to adduce sufficient evidence that they entered into an oral contract

1   with any Defendant so as to create a genuine issue of material fact on the claim;
2   and

3         5.      Plaintiffs' claim for unfair competition under California Business &
4   Professions Code §17200 *et seq.* fails because Plaintiffs have failed to adduce
5   sufficient evidence of any conduct by Defendants upon which a violation could
6   be found and because Plaintiffs have no recoverable damages under the
7   applicable statutory provisions.

8         This Motion is made following in-person conferences of counsel pursuant to
9   Local Rule 7-3, which took place on Thursday, May 21, 2008 and Friday, June 27,
10  2008, and in written correspondence between the parties' counsel.

11        This Motion is based upon this Notice and the accompanying Memorandum
12  of Points and Authorities, the declarations and exhibits filed herewith, the
13  concurrently filed separate statement of uncontroverted facts and conclusions of
14  law, the pleadings and other documents on file in this action, and on such other and
15  further evidence and arguments as may hereafter be adduced.

16

17  DATED:  July 31, 2008                  Respectfully submitted,
18                                          CALDWELL LESLIE & PROCTOR, PC
19
20                                          By _____/S/_____
21                                              ANDREW ESBENSHADE
22                                              Attorneys for Defendants
23
24
25
26
27
28

CALDWELL
LESLIE &
PROCTOR

1

2

# TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................1

II.     FACTUAL BACKGROUND ......................................................4

    A.      The Marshall University Plane Crash...................................4

    B.      ESPN Documentary.............................................................4

    C.      Ashes to Glory ....................................................................5

    D.      Discussions with Plaintiffs Regarding an Option Agreement on Ashes To Glory ...............................................................5

        1.      Mary Viola's Interest in the Marshall Story .............5

        2.      Mary Viola Approaches Plaintiffs to Discuss the Possible Acquisition of Option Rights to Ashes to Glory .........6

        3.      Discussions between the Parties Terminate with No Agreement Reached ..................................................8

    E.      The Parties Go Their Separate Ways and Plaintiffs Attempt to Sell Ashes to Glory Elsewhere .............................................9

        1.      Plaintiffs Attempt to Sell Ashes to Glory to Other Producers..................................................................9

        2.      Iwanyk and Viola Move Forward with Their Marshall Project.....................................................................10

        3.      Plaintiffs Re-release Ashes To Glory to Capitalize on the Release of We Are Marshall ...................................11

III.    ARGUMENT ........................................................................11

    A.      Legal Standard for Summary Judgment .............................11

    B.      There Was No Written or Oral Contract between the Parties ...........12

CALDWELL
LESLIE &
PROCTOR

|  |  | 1. | No Agreement Was Reached on the Material Terms of an Option Contract for Ashes to Glory ............................... 12 |
| --- | --- | --- | --- |
|  |  | 2. | The Two Documents Which Plaintiffs Allege Are Written Contracts Are Plainly Not Contracts .................... 13 |
|  |  | 3. | No Oral Contract Existed ........................................... 14 |
|  | C. | | Plaintiffs' Breach of Implied-In-Fact Claim Is Without Basis .......... 14 |
|  |  | 1. | Plaintiffs Did Not Disclose Ashes to Glory to Plaintiffs, So They Cannot Prove a Desny Claim .................................. 14 |
|  |  | 2. | The Parties Never Reached Agreement on the Material Terms of an Option Contract for Ashes to Glory ................... 16 |
|  | D. | | There Is No Basis for Plaintiffs' Unfair Competition Claim ............. 17 |
|  | E. | | There is No Basis for Plaintiffs' Copyright Infringement Claim ....... 19 |
|  |  | 1. | There Is No Evidence of Copying of Protectable Elements of Plaintiffs' Work ................................. 20 |
|  |  | 2. | Plaintiffs Cannot Set Forth Sufficient Similarity of Protectable Expression to Show Infringement ...................... 22 |
| IV. | | | CONCLUSION ........................................... 25 |

CALDWELL
LESLIE &
PROCTOR

1

# TABLE OF AUTHORITIES

2

Page(s)

3

<u>Cases</u>

4

*Anderson v. Liberty Lobby*,
5
     477 U.S. 242 (1986) ................................................................ 11-12

6

*Apple Computer, Inc. v. Microsoft Corp.*,
7
     35 F.3d 1435 (9th Cir.1994) ......................................................20

8

*Bustamante v. Intuit, Inc.*,
9
     141 Cal.App.4th 199 (2006) .......................................................12

10

*Cavalier v. Random House, Inc.*,
11
     297 F.3d 815 (9th Cir. 2002) .....................................................19

12

*Celotex Corp. v. Catrett*,
13
     477 U.S. 317 (1986) ..................................................................11

14

*Chase-Riboud v. Dreamworks, Inc.*,
15
     987 F.Supp. 1222 (C.D. Cal. 1997) ...........................................20

16

*Coleman v. Quaker Oats Co.*,
17
     232 F.3d 1271 (9th Cir. 2000) ...................................................16

18

*Desny v. Wilder*,
19
     46 Cal.2d 715 (1956) ............................................................ 14-15

20

*Family Home & Fin. Ctr. v. Federal Home Loan Mortgage Corp.*,
21
     461 F.Supp.2d 1188, (C.D. Cal. 2006) .................................. 17-18

22

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*,
23
     499 U.S. 340 (1991) ..................................................................19

24

*Funky Films, Inc. v. Time Warner Entm't Co.*,
25
     462 F.3d 1072 (9th Cir. 2006) ............................... 19, 20, 21, 24-25

26

*Grosso v. Miramax Film Corp.*,
27
     383 F.3d 965 (9th Cir. 2004) ................................................ 14-15

28

CALDWELL
LESLIE &
PROCTOR

*Hoehling v. Universal City Studios, Inc.*,
    618 F.2d 972 (2d Cir. 1980) ....................................................................20

*Jonathan Browning, Inc. v. Venetian Casino Resort, LLC*,
    2007 WL 4532214 (N.D. Cal., Dec. 19, 2007) .........................................15

*Korea Supply Co. v. Lockheed Martin Corp.*,
    29 Cal.4th 1134 (2003) ............................................................................18

*Kouf v. Walt Disney Pictures & Television*,
    16 F.3d 1042 (9th Cir. 1994) ...................................................................19

*Kruse v. Bank of America*,
    202 Cal.App.3d 38 (1988) ........................................................................12

*Kurlan v. Columbia Broadcasting Sys.*,
    40 Cal.2d 799 (1953) ................................................................................17

*Maglica v. Maglica*,
    66 Cal.App.4th 442 (1998) .......................................................................16

*Mason v. Woodland Sav. & Loan Ass'n*,
    254 Cal.App.2d 41 (1967) ........................................................................13

*Narell v. Freeman*,
    872 F.2d 907 (9th Cir.1989) ...............................................................20, 21

*National Rural Telecomm. Co-op. v. DIRECTV, Inc.*,
    319 F.Supp.2d 1059 (C.D. Cal. 2003) ......................................................18

*Zenith Ins. Co. v. Cozen O'Connor*,
    148 Cal.App.4th 998 (2007) .....................................................................16


Statutes

17 U.S.C. § 102(b) ............................................................................................20

CALDWELL
LESLIE &
PROCTOR

Rules & Regulations

Fed. R. Civ. P. 56(c)  ...............................................................................11

CALDWELL
LESLIE &
PROCTOR

## MEMORANDUM OF POINTS AND AUTHORITIES

# I.   INTRODUCTION

Plaintiffs and two Defendants, Mary Viola and Basil Iwanyk, had discussions about a possible option contract for the rights to Plaintiffs' documentary *Ashes to Glory*, which chronicles the events before and after the 1970 crash of a plane carrying the Marshall University football team, coaching staff and boosters. Plaintiffs have admitted that when these discussions ended in March 2004, there was no agreement as to *any* specific terms and that the parties were "very far apart on the financial considerations, and that was to be negotiated."  (*See* Separate Statement of Uncontroverted Facts and Conclusions of Law ("Sep. Stmnt.") No. 47).  The agent Plaintiffs hired to negotiate a possible deal for them testified unequivocally that no agreement was ever reached.  The parties went their separate ways, with Viola and Iwanyk informing Plaintiffs' agent that they would be moving forward with their Marshall film project and with Plaintiffs seeking to sell the rights to their publicly released documentary to numerous other production companies.  Plaintiffs' efforts to sell their documentary never succeeded.

More than two years later, the feature film *We Are Marshall* was released. Plaintiffs re-released *Ashes to Glory* on DVD to coincide with the release of *We Are Marshall* in theatres and to capitalize on the publicity surrounding the film.

Despite these undisputed facts, Plaintiffs brought suit against a number of individuals and entities involved in the production of *We Are Marshall* claiming breach of written and oral contracts, breach of an implied-in-fact contract, a violation of California's unfair competition law, and copyright infringement. Plaintiffs' own testimony, along with that of their agent, demonstrates that no contract was ever reached.  Plaintiff Deborah Novak testified that there were at least eight material terms never agreed upon, including the purchase price for *Ashes to Glory*.  (Sep. Stmnt. No. 46).  Plaintiffs' agent testified that the parties never reached

CALDWELL
LESLIE &
PROCTOR

an agreement related to *Ashes to Glory*.  (Sep. Stmnt. No. 51).  Plaintiffs' efforts to now claim an enforceable agreement was reached are frivolous.

Plaintiffs' breach of implied-in-fact contract claim is based on the allegation that Plaintiffs "disclosed *Ashes to Glory* to Defendants under circumstances from which it could be concluded that Defendants voluntarily accepted the disclosure, knowing the conditions on which it was tendered."  (First Amended Complaint ("FAC"), ¶57).  Again, the claim is contradicted by the undisputed facts.  *Ashes to Glory* aired on public television and was publicly available on VHS three years before Defendant Mary Viola first contacted Plaintiffs about an option contract. Plaintiffs' own testimony establishes that there was no "disclosure" of *Ashes to Glory* by Plaintiffs to Defendants.  (Sep. Stmnt. No. 18) (Novak testifying that Viola and Iwanyk "already had the documentary when they contacted us.").

Plaintiffs' unfair competition claim under California Business & Professions Code § 17200 is also fatally flawed.  Plaintiffs' claim relies on statements by Viola and Iwanyk during the parties' discussions that they were working toward and expected to reach an agreement with Plaintiffs.  Plaintiffs have adduced no evidence that any statements were made by Viola and Iwanyk with an intent to defraud Plaintiffs so as to support an unfair competition claim under Section 17200.  If Plaintiffs' allegations were sufficient to reach a jury, then every failed contract negotiation would become an unfair competition claim.  In any case, Plaintiffs have no recoverable damages under Section 17200 because they never gave any money or property to Defendants and thus there is no basis for restitution, the only monetary recovery available under Section 17200.

Finally, Plaintiffs' copyright infringement claim fails as well.  Plaintiffs' work, *Ashes to Glory,* was aired on public television – one of several documentaries chronicling the historical events surrounding the 1970 plane crash of the Marshall University football team, coaches and boosters.  The documentary was a historically

1  accurate account of actual events told through photographs, footage, newspaper
2  headlines, and interviews with those with knowledge of the subject.
3          Defendants' work, *We Are Marshall,* is a feature film dramatizing some of the
4  same historical events as *Ashes to Glory*.  It uses actors playing real individuals and
5  fictional characters enacting events which are often altered or invented entirely for
6  dramatic effect, using dialogue that was virtually all independently created.
7          Although historical facts and events are not copyrightable, Plaintiffs bring an
8  infringement claim under their misguided view that the Marshall plane crash and
9  subsequent rebuilding of the football team, culminating with the team's win the next
10 year in its first home game, is *their story* and cannot be the subject of a film without
11 purchasing the rights to their documentary.  (Sep. Stmnt. No. 7).  In fact, Novak
12 testified that nobody making a film relating to the Marshall plane crash may view
13 Plaintiffs' documentary because they would "be looking to steal the story." (Sep.
14 Stmnt. No. 8).
15         While the copyright analysis submitted herewith by expert Mark Rose
16 painstakingly details the lack of substantial similarity between the documentary and
17 the film, that analysis merely confirms what is clear to anyone who views both
18 works – they are very different presentations of the 1970 plane crash and the
19 subsequent efforts to rebuild the Marshall University football program.  The limited
20 similarities in the two works stem from the mere fact that the works cover some of
21 the same historical ground.[1]  Plaintiffs cannot identify concrete, protectable elements
22 of *Ashes to Glory* that appear in *We Are Marshall* and, in fact, the presentation of the
23 historical events at issue in *Ashes to Glory* and *We Are Marshall* could hardly be
24 more different.  Summary judgment must therefore be granted to Defendants.
25
26
27
28

CALDWELL
LESLIE &
PROCTOR

---

[1] DVD versions of both *Ashes to Glory* and *We Are Marshall* are attached as
Exhibits 1 and 2 to the Declaration of Andrew Esbenshade.

## II.   FACTUAL BACKGROUND

### A.   *The Marshall University Plane Crash*

On November 14, 1970, a plane carrying most of the Marshall University football team and coaches, as well as a number of team boosters, back from a game against East Carolina crashed just outside Huntington, West Virginia.  All seventy-five people on board were killed.  It is the worst disaster in the history of collegiate athletics in this country.  After cancelling the final game of the 1970 football season, Marshall began the process of rebuilding its football program.

The school hired Jack Lengyel as the new head coach and William "Red" Dawson, an assistant coach who went on a recruiting trip after the East Carolina game and thus was not on the flight, returned as an assistant coach.  The 1971 team was largely made up of the few players who were not on the 1970 flight, freshmen who were ineligible to play in 1970, and incoming freshmen.  Ten months after the crash, in Marshall's first home game of the 1971 season, the team defeated Xavier University on the last play of the game by the score of 13-9.

In a 1993 article entitled "Rising from the Ashes," journalist Ernie Salvatore traced the journey from the depths of the crash to the heights of the implausible win over Xavier, describing it as "the stuff of cheap Hollywood plot boilers" and the Xavier game as "Marshall's greatest football victory."  (Sep. Stmnt. No. 1).  The article described in detail the last-second winning touchdown scored by Marshall over Xavier and Salvatore noted that the crowd "wouldn't leave for hours" after the game.  (Sep. Stmnt. No. 2).  Novak read Salvatore's article prior to producing *Ashes to Glory*.  (Sep. Stmnt. No. 3).

### B.   *ESPN Documentary*

In 2000, the thirtieth anniversary of the Marshall plane crash, ESPN aired a one-hour documentary on the subject entitled *Remembering Marshall:  Tragedy to Triumph*.  The ESPN documentary covered the 1970 plane crash, Marshall's efforts

CALDWELL
LESLIE &
PROCTOR

to rebuild and climaxed with the 1971 victory over Xavier.  (Sep. Stmnt. No. 4).
The ESPN documentary aired before *Ashes to Glory*.  (Sep. Stmnt. No. 5).

### C.      *Ashes to Glory*

Shortly after the ESPN documentary was released in 2000, the documentary *Ashes to Glory: The Tragedy and Triumph of Marshall University Football* ("*Ashes to Glory*") was produced by Plaintiffs Deborah Novak and John Witek in conjunction with West Virginia Public Television and aired on public television. *Ashes to Glory* examines the history of Marshall football, covers the 1970 season in great depth, and then moves on to the plane crash and the rebuilding of the football team after the crash, including the victory over Xavier in 1971.  (Sep. Stmnt. No. 6). Plaintiffs endeavored to make *Ashes to Glory* a historically accurate account of the events it covers.  (Sep. Stmnt. No. 9).

*Ashes to Glory* covers both the pre- and post-crash periods in nearly equal parts.  (Sep. Stmnt. No. 10).  It is approximately one hour and fifteen minutes into *Ashes to Glory* before the issue of whether football will continue at Marshall after the crash is raised.  (Sep. Stmnt. No. 11).  By contrast, *We Are Marshall* focuses almost entirely on the post-crash story.  *We Are Marshall* opens on the day of the crash and resolves the issue of whether football will continue within the first thirty minutes, while the rest of the film focuses on the efforts of Jack Lengyel and Red Dawson to rebuild the Marshall football team.  (Sep. Stmnt. No. 12).

### D.      *Discussions with Plaintiffs Regarding an Option Agreement on Ashes To Glory*

#### 1.      Mary Viola's Interest in the Marshall Story

In 2002, Mary Viola became interested in producing a feature film about the Marshall plane crash.  (Sep. Stmnt. No. 15).  Viola read numerous articles about the Marshall crash and the aftermath of the crash, and saw at least two documentaries on the subject, one of which was *Ashes to Glory*.  (Sep. Stmnt. No. 16).  In September

CALDWELL
LESLIE &
PROCTOR

of 2002, Viola registered a treatment for a feature film on the subject with the Writers' Guild of America.  (Sep. Stmnt. No. 17).

### 2. Mary Viola Approaches Plaintiffs to Discuss the Possible Acquisition of Option Rights to *Ashes to Glory*

In November 2003, Viola and a friend named Kristi Felton contacted Deborah Novak about the possibility of optioning the rights to *Ashes to Glory* in conjunction with the Marshall project Viola was pursuing.  Viola had watched *Ashes to Glory* prior to any discussions with Plaintiffs.  (Sep. Stmnt. No. 18).

On December 12, 2003, Felton sent Novak the sample pro forma agreement attached to Plaintiffs' FAC as Exhibit A.  (Sep. Stmnt. No. 19).  The document does not contain Novak's or Witek's name.  (Sep. Stmnt. No. 20).  Nor does it reference *Ashes to Glory*.  (Sep. Stmnt. No. 21).  Felton's cover email stated that the document was sent "as a sample for you to review – it's not a binding agreement by any means, so no need to fill it out or sign."  (Sep. Stmnt. No. 22).

Novak testified that Exhibit A was "part of the negotiation process."  (Sep. Stmnt. No. 23).  Plaintiffs never signed the document.  (Sep. Stmnt. No. 24).  Plaintiffs nevertheless allege that this document is "a contract between Plaintiffs on the one hand and Defendants on the other."  (FAC, ¶¶ 28, 65).

Plaintiffs and Viola continued to communicate about a possible option agreement.  On February 2, 2004, Viola sent Plaintiffs a draft agreement which is attached to Plaintiffs' FAC as Exhibit B.  (Sep. Stmnt. No. 25).  Viola's cover letter states that the document is a "draft," that it still needs to be reviewed by lawyers and that certain changes will have to be made.  (Sep. Stmnt. No. 26).  Novak subsequently described the document as a "draft option agreement."  (Sep. Stmnt. No. 27).  Novak also acknowledged that the document was not supposed to be sent to Plaintiffs by Viola because it "should have gone to [Basil Iwanyk's] lawyer for revisions."  (Sep. Stmnt. No. 28).  Novak noted two specific changes that would have to be made to the document and also that Viola had asked Novak and Witek to

CALDWELL
LESLIE &
PROCTOR

1   "compile a list of what [Novak and Witek] would like to see included in this

2   agreement."  (Sep. Stmnt. No. 29).

3       Plaintiffs never signed the document.  (Sep. Stmnt. No. 30).  Plaintiffs

4   nevertheless allege Exhibit B is "a contract between Plaintiffs and Defendants

5   IWANYK, THUNDER ROAD, VIOLA and all other Defendants . . . for the

6   purchase of the rights to *Ashes to Glory*."  (FAC, ¶¶ 33, 67).

7       Viola suggested Plaintiffs get a representative to review possible contracts.

8   (Sep. Stmnt. No. 31).  On February 18, 2004, Novak informed Viola that further

9   negotiations should be handled through Plaintiffs' agent Jonathan Westover.  (Sep.

10  Stmnt. No. 32).  Westover testified that Plaintiffs never told him that they had

11  already reached an agreement.  (Sep. Stmnt. No. 33).  Rather, Plaintiffs hired

12  Westover to negotiate a contract on their behalf.  (Sep. Stmnt. No. 34).

13      Plaintiffs informed Westover that they wanted any agreement to include the

14  following:  1) Plaintiffs would retain all rights in *Ashes to Glory* other than the story

15  rights to make a feature film; 2) an option fee of $2,500 – $5,000; 3) a purchase

16  price of $60,000 – $100,000; 4) a story credit for Plaintiffs; 5) co-producer credit for

17  Plaintiffs and compensation of $300,000 – $500,000; 6) an unspecified bonus based

18  on the film's gross; and 7) that the studio would consider including *Ashes to Glory*

19  as a bonus feature on the film's DVD release for additional compensation.  (Sep.

20  Stmnt. No. 35).  On February 25, 2004, in a telephone call with Westover, Plaintiffs

21  stated that they wanted a minimum of $500,000 total compensation in any deal with

22  Thunder Road.  (Sep. Stmnt. No. 36).

23      On March 8, 2004, Viola and Iwanyk sent a letter to Westover outlining their

24  understanding of the status of negotiations and setting forth "the points currently

25  being discussed" for an option contract.  (Sep. Stmnt. No. 37).  The points outlined

26  in the letter gave Thunder Road a free option on *Ashes to Glory* for four months with

27  a purchase price of not less than $15,000 if Thunder Road decided to purchase the

28

CALDWELL
LESLIE &
PROCTOR

1  rights to *Ashes to Glory*.  (Sep. Stmnt. No. 38).  The points laid out in the letter did

2  not meet the terms Plaintiffs had provided to Westover.  (Sep. Stmnt. No. 39).

3       Westover does not recall if he countered or responded in any way to the

4  March 8, 2004, letter from Iwanyk and Viola (Sep. Stmnt. No. 40), but

5  acknowledges that negotiations ended on or around March 17, 2004, after a call he

6  had with Basil Iwanyk.[2]  (Sep. Stmnt. No. 42).  Iwanyk informed Westover that

7  Iwanyk and Viola intended to move forward with their Marshall project without

8  Plaintiffs.  (Sep. Stmnt. No. 43).

9       Plaintiffs never provided any written material to any Defendant.  (Sep. Stmnt.

10  No. 44).  Westover also never provided Defendants with any written material from

11  Plaintiffs.  (Sep. Stmnt. No. 45).

12       **3.    Discussions between the Parties Terminate with No**

13              **Agreement Reached**

14       While Plaintiffs may seek to manufacture a factual dispute about *how*

15  negotiations ended, there is no dispute that they ended without any agreement being

16  reached, and that is the only material fact for this motion.  Novak testified that no

17  agreement was reached as to the following terms:  1) the purchase price for *Ashes To*

18  *Glory*; 2) whether Plaintiffs would receive producer credit and/or compensation; 3)

19  whether Plaintiffs would receive consultant credit and/or compensation; 4) whether

20  Plaintiffs would receive writing credit and/or compensation; 5) whether Plaintiffs

21  would receive "points on the back end"; 6) whether *Ashes To Glory* would be put on

22  the *We Are Marshall* DVD as a bonus feature; 7) whether Novak would be able to

23

24  [2] While Westover does not recall his response, Iwanyk and Viola both recall that
   Westover countered with an exorbitant demand for an option on *Ashes to Glory* and,
25  when it was clear Iwanyk and Viola would not agree, he stated to Viola that
   Plaintiffs would therefore be taking their documentary to other producers.  (Sep.
26  Stmnt. No. 41).  Notably, this testimony is consistent with Novak's testimony that
   the parties were "very far apart on the financial considerations" when negotiations
27  ended.  (Sep. Stmnt. No. 47).  Nevertheless, the only "material" fact for this motion
28  is the undisputed fact that Plaintiffs did not accept the terms set forth in the letter.

CALDWELL
LESLIE &
PROCTOR

audition for an acting role; and 8) what rights Defendants would receive in *Ashes to Glory*.  (Sep. Stmnt. No. 46).

Novak also testified that at the time that negotiations with Viola and Iwanyk ended in March 2004, there was "not a full agreement reached" and that the parties were "very far apart on the financial considerations, and that was to be negotiated." (Sep. Stmnt. No. 47).  Witek sat through all of Novak's testimony and subsequently testified that he agreed with all of it.  (Sep. Stmnt. No. 50).

Novak also testified that she and Witek hired Jonathan Westover to negotiate for Plaintiffs and that Westover took over negotiations after he was hired.  (Sep. Stmnt. No. 34).  Westover testified as follows:

"Q:  Did you ever reach an agreement with anyone to option or buy the rights to Ashes to Glory?  A:  No."  (Sep. Stmnt. No. 51).

"Q:  And you were the agent of Miss Novak and Mr. Witek in attempting to negotiate an agreement with Thunder Road, correct?  A:  Yes.  Q:  And no such agreement was ever reached?  A:  Correct."  (Sep. Stmnt. No. 51).

**E.    *The Parties Go Their Separate Ways and Plaintiffs Attempt to Sell Ashes to Glory Elsewhere***

**1.    Plaintiffs Attempt to Sell *Ashes to Glory* to Other Producers**

Because no agreement was reached with Defendants, Westover sent *Ashes to Glory* to over a dozen other production companies and studios beginning in late March 2004 in an attempt to sell the documentary for use in making a feature film. (Sep. Stmnt. No. 53).  Novak approved Westover's sending *Ashes to Glory* to other production companies and studios.  (Sep. Stmnt. No. 54).  None of the individuals Westover contacted were interested in pursuing a deal with Plaintiffs regarding *Ashes to Glory*.  (Sep. Stmnt. No. 56).  Westover stopped trying to sell *Ashes to Glory* on or about May 5, 2004.  (Sep. Stmnt. No. 57).

Novak testified that she approved Westover's sending *Ashes to Glory* to other producers beginning in late March of 2004.  (Sep. Stmnt. No. 54).  Novak claimed

that she did so in order to gain leverage with Iwanyk and Viola and get them to "negotiate more vigorously with us" (Sep. Stmnt. No. 55),  but no further discussions about an option contract took place.  (Sep. Stmnt. No. 58).

Novak also attempted to sell *Ashes to Glory* elsewhere.  In April of 2004, she was looking for production companies or studios that would be interested in buying *Ashes to Glory*.  (Sep. Stmnt. No. 59).  On June 30, 2004, over three months after all discussions with Defendants ended, Novak submitted *Ashes to Glory* to ESPN for consideration in making a movie.  (Sep. Stmnt. No. 60).

> ## 2.   Iwanyk and Viola Move Forward with Their *Marshall* Project

Viola and Iwanyk told Westover that they were moving ahead with their Marshall project without Plaintiffs' involvement, and they did so.  They had already met with writers Jamie Linden and Cory Helms when negotiations with Novak and Witek ended.  (Sep. Stmnt. No. 61).  Viola and Iwanyk decided to move forward with Linden and Helms as the writers and to pitch the project to Warner Bros.  (Sep. Stmnt. No. 62).

Linden's interest in writing a movie about the Marshall plane crash went back to his college days at Florida State.  (Sep. Stmnt. No. 63).  Linden researched the crash and the rebuilding of the football team after hearing about the story from news reports published to commemorate the thirtieth anniversary of the plane crash.  (Sep. Stmnt. No. 64).  At that time, Linden read newspaper and magazine articles and did online research about the historical events.  (Sep. Stmnt. No. 65).  In approximately September of 2003, Linden returned to the potential Marshall project and prepared a document outlining thoughts for what a Marshall movie might look like.  (Sep. Stmnt. No. 66).  He continued to work on the document into early 2004.  (Sep. Stmnt. No. 67).  In late December of 2003, he ordered the DVD of *Ashes to Glory* as part of his research efforts.  (Sep. Stmnt. No. 68).

CALDWELL
LESLIE &
PROCTOR

In 2004, Viola, Iwanyk, Linden and Helms pitched their Marshall project to Warner Bros. and Warner Bros. gave them the green light to move forward.  (Sep. Stmnt. No. 69).  *We Are Marshall* was released in December 2006.

### 3. Plaintiffs Re-release *Ashes To Glory* to Capitalize on the Release of *We Are Marshall*

In March of 2006, Witek wrote to Warner Home Video inquiring whether Warner would be interested in distributing *Ashes to Glory*.  (Sep. Stmnt. No. 70).

In late 2006, *Ashes to Glory* was re-released on DVD to "capitalize" on the release of *We Are Marshall* in theatres and Witek testified that the re-release resulted in "additional sales" of the *Ashes to Glory* DVD and additional money to Witek and Novak. (Sep. Stmnt. No. 71).  In fact, the re-released *Ashes to Glory* was marketed as "[t]he true story behind the Warner Brothers feature film *We Are Marshall* starring Matthew McConaughey, premiering in December 2006."  (Sep. Stmnt. No. 72).

## III.  ARGUMENT

### A. *Legal Standard for Summary Judgment*

Federal Rule of Civil Procedure 56(c) establishes that summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Where the non-moving party bears the burden of proving at trial an element essential to its case, the moving party may point out the absence of admissible evidence to support the element and the non-moving party must then sufficiently establish a genuine dispute of fact with respect to that element or face summary judgment.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986).  Only genuine disputes – where the evidence is such that a reasonable jury could return a verdict for the non-moving party – over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  *Anderson v. Liberty Lobby*, 477 U.S. 242,

248 (1986).

**B.** *There Was No Written or Oral Contract between the Parties*

    **1.** **No Agreement Was Reached on the Material Terms of an Option Contract for *Ashes to Glory***

The parties never reached agreement on the material terms of a contract, either orally or in writing. This was admitted by Novak and it was admitted by Plaintiffs' agent, who handled the negotiations on Plaintiffs' behalf.

It is a basic tenet of contract law that creation of a valid contract requires mutual assent. *Kruse v. Bank of America*, 202 Cal.App.3d 38, 59 (1988). "If there is no evidence establishing a manifestation of assent to the 'same thing' by both parties, then there is no mutual consent to contract and no contract formation." *Bustamante v. Intuit, Inc.,* 141 Cal.App.4th 199, 208 (2006) (citation omitted). In order to have an enforceable contract, the mutual agreement must cover all material terms of the proposed contract. *Id.* at 215 ("[T]he failure to reach a meeting of the minds on all material points prevents the formation of a contract *even though the parties have orally agreed upon some of the terms, or have taken some action related to the contract*.") (emphasis in original; citation omitted). Where the material facts are undisputed, the existence of a contract is a question for the court to decide. *Id.* at 208 (affirming summary judgment for defendants because there was no mutual agreement on certain material terms of the contemplated contract).

The testimony from Plaintiff Deborah Novak and Plaintiffs' agent Jonathan Westover could hardly be more clear in conveying that there was no mutual agreement between the parties as to the material terms of the contemplated option contract. Novak testified that at the time that negotiations with Defendants Viola and Iwanyk ended in March 2004, there was no agreement as to the purchase price for *Ashes to Glory*, the credit or compensation that Plaintiffs would receive, what rights Defendants would get in *Ashes to Glory* and several other material terms.

1   (Sep. Stmnt. No. 46).  According to Novak, the parties were "very far apart on the
2   financial considerations, and that was to be negotiated."  (Sep. Stmnt. No. 47).

3         Plaintiffs' agent Jonathan Westover testified unequivocally that he was
4   Plaintiffs' agent in attempting to negotiate an agreement and that no agreement was
5   reached.  (Sep. Stmnt. No. 51).  The sworn testimony of Plaintiffs and their agent as
6   to the lack of mutual agreement on material terms precludes a finding that a contract
7   existed between the parties.  "Oral or written, the agreement between the parties is
8   not complete so long as [a] 'detail,' at the heart of their enterprise, is left unsettled."
9   *Mason v. Woodland Sav. & Loan Ass'n*, 254 Cal.App.2d 41, 44 (1967).  Here, it was
10  not "a detail" but all details that were left unsettled when negotiations broke off.
11  Plaintiffs' breach of written and oral contract claims must fail.

                    **2.     The Two Documents Which Plaintiffs Allege Are Written
12
13                          Contracts Are Plainly Not Contracts**

14        Despite the fact that they and their agent admitted under oath that no
15  agreement was reached on material terms of a possible deal, Plaintiffs purport to rely
16  on two documents as forming what they claim is a written contract between the
17  parties.  These documents are attached to the FAC as Exhibits A and B.  (*See* FAC at
18  ¶¶65, 67).  The undisputed evidence demonstrates that neither Exhibit A nor Exhibit
19  B is an enforceable contract.

20        Exhibit A does not have Plaintiffs' names in it, nor does it reference *Ashes to*
21  *Glory.*  (Sep. Stmnt. Nos. 20, 21).  The cover email sent to Plaintiffs with the
22  document describes it "as a sample for you to review – it's not a binding agreement
23  by any means, so no need to fill it out or sign."  (Sep. Stmnt. No. 22).  Plaintiffs
24  never signed the document.  (Sep. Stmnt. No. 24).

25        Exhibit B to the FAC was identified by both Novak and Viola as a "draft."
26  (Sep. Stmnt. Nos. 26, 27).  Plaintiffs never signed Exhibit B.  (Sep. Stmnt. No. 30).
27  Further, Plaintiff Novak admitted she was told by Viola that the document should

28

CALDWELL
LESLIE &
PROCTOR

1  not have been sent to Novak and Witek because Iwanyk's lawyers had not reviewed
2  the document and changes would have to be made.  (Sep. Stmnt. No. 28).

3         Finally, Jonathan Westover was hired by Plaintiffs to conduct negotiations
4  and was never told by Plaintiffs that an agreement was already reached or that
5  Exhibits A or B were agreements.  (Sep. Stmnt. No. 33).  Under the undisputed facts,
6  the assertion that Exhibits A and/or B to the FAC are enforceable written contracts is
7  frivolous.[3]

8                    **3.      No Oral Contract Existed**

9         In addition to the evidence cited above making clear that no agreement of any
10 kind was ever reached, Novak specifically testified that all terms of the alleged oral
11 contract beyond the assertion that Viola and Iwanyk wanted to use *Ashes to Glory* in
12 making a feature film were in the process of negotiation when negotiations ended.
13 (Sep. Stmnt. No. 48).

14        Based on the undisputed facts, Plaintiffs' breach of written and oral contract
15 claims must be dismissed.

16    **C.    *Plaintiffs' Breach of Implied-In-Fact Claim Is Without Basis***

17           **1.      Plaintiffs Did Not Disclose *Ashes to Glory* to Plaintiffs, So**
18                   **They Cannot Prove a *Desny* Claim**

19        To establish a breach of implied-in-fact contract claim, a plaintiff must show
20 that he or she "disclosed the work to the offeree for sale, and did so under
21 circumstances from which it could be concluded that the offeree voluntarily accepted
22 the disclosure knowing the conditions on which it was tendered and the reasonable
23 value of the work."  *Grosso v. Miramax Film Corp.*, 383 F.3d 965, 967 (9th Cir.
24 2004) (summarizing the holding in *Desny v. Wilder*, 46 Cal.2d 715 (1956)).  The
25 *Desny* rule that a contract will only be implied where the work was disclosed by the

26
27
28
CALDWELL
LESLIE &
PROCTOR

---

[3] Defendants' counsel wrote Plaintiffs' counsel a detailed letter and had several subsequent
discussions asking that Plaintiffs dismiss the breach of contract claims, but Plaintiffs
refused.

plaintiff for sale "is justified on the theory that the bargain is not for the idea itself, but for the services of conveying that idea."  *Grosso*, 383 F.3d at 967 (citation omitted).

Plaintiffs here parrot the language of *Grosso* and *Desny* to allege a breach of implied-in-fact-contract claim.  (*See* FAC, ¶57 (alleging "Plaintiffs submitted *Ashes to Glory* to Defendants for sale . . .  Plaintiffs disclosed *Ashes to Glory* under circumstances from which it could be concluded that Defendants voluntarily accepted the disclosure, knowing the conditions on which it was tendered.")).  However, the undisputed facts show there can be no *Desny* claim because Plaintiffs did not disclose *Ashes to Glory* to Defendants.  Rather, *Ashes to Glory* was a publicly released and available documentary that Defendant Viola watched before Defendants had any discussion with Plaintiffs about a possible contract.

Novak testified that Viola and Iwanyk "already had the documentary when they contacted us.  . . . So there was no need for us to provide them with a documentary."  (Sep. Stmnt. No. 18).  Plaintiffs' FAC concedes that Defendants "first obtained access" to *Ashes to Glory* when Defendant Viola "came across" the DVD, "prompting her to contact Plaintiffs . . ."  (FAC, ¶43).  In fact, neither Plaintiffs nor their agent ever submitted any of Plaintiffs' written material to Defendants.  (Sep. Stmnt. Nos. 44, 45).

Thus, Plaintiffs' own allegations and admissions firmly establish that they did not "disclose" *Ashes to Glory* to Defendants as required to establish an implied-in-fact contract claim under *Desny* and *Grosso*.  *See, e.g., Jonathan Browning, Inc. v. Venetian Casino Resort, LLC*, 2007 WL 4532214, at *8 (N.D. Cal., Dec. 19, 2007) (dismissing an implied-in-fact contract where the plaintiff's lighting fixture designs were "widely disclosed" to the general public before the plaintiff's alleged disclosure of the designs to the defendant).  Rather than disclosing *Ashes to Glory* to Defendants for sale as alleged, Plaintiffs released the documentary to the general public.  There is no basis for Plaintiffs' implied-in-fact contract claim under *Desny*.

CALDWELL
LESLIE &
PROCTOR

## 2.     The Parties Never Reached Agreement on the Material Terms of an Option Contract for *Ashes to Glory*

To the extent Plaintiffs seek to argue that an implied-in-fact contract existed outside the confines of a *Desny* claim, such a claim is not encompassed in the operative pleading, has not been raised in the case to date, and cannot be advanced for the first time at this late stage of the litigation.  *See, e.g., Coleman v. Quaker Oats Co.,* 232 F.3d 1271, 1295 (9th Cir. 2000) (affirming District Court's refusal to allow Plaintiffs to amend pleadings to state a new theory in connection with a summary judgment motion).

Even if it had been properly pleaded, such a claim would fail for the same reason as Plaintiffs' express contract claims – the parties never reached agreement on the material terms of a possible contract.  An implied-in-fact contract, like an express oral or written contract, is founded upon a meeting of minds.  *See, e.g., Zenith Ins. Co. v. Cozen O'Connor,* 148 Cal.App.4th 998, 1010 (2007) ("An implied contract . . . in no less degree than an express contract, must be founded upon an ascertained agreement of the parties to perform it . . .'") (citation omitted).  The only distinction between an implied-in-fact contract and an express contract is that an implied-in-fact contract is formed through the parties' conduct rather than expressly set forth in words.  *See, e.g., Maglica v. Maglica*, 66 Cal.App.4th 442, 455 (1998) ("an implied-in-fact contract entails an actual contract, but one manifested in conduct rather than expressed in words").

The testimony of Plaintiffs and their agent, detailed above, establishes that there was no meeting of the minds on *any specific terms* of an agreement, let alone all material terms as required.  In fact, Novak specifically testified that the purported "implied contract" consisted of an understanding that Viola and Iwanyk wanted to use *Ashes to Glory* in making a film and "[t]he other terms were all to be worked out."  (Sep. Stmnt. No. 49).

CALDWELL
LESLIE &
PROCTOR

Finally, even if Plaintiffs could somehow establish an implied-in-fact contract was reached, they have failed to establish "use" of *Ashes to Glory* so as to show a breach.  To establish that Defendants "used" their ideas so that they can prevail on the breach of implied contract claim, Plaintiffs must demonstrate that "substantial similarities" exist between the two works.  *See, e.g., Kurlan v. Columbia Broadcasting Sys.,* 40 Cal.2d 799 (1953).  Although the substantial similarity requirement in this context is not identical to the substantial similarity required to prove copying in the copyright sense, Plaintiffs here cannot show any significant similarity between the works in order to meet their burden, as described in detail in the Declaration of Mark Rose and in Section E, below.

The undisputed facts preclude a finding that the parties reached agreement as to the material terms of an option contract so as to create an implied-in-fact contract outside of *Desny.*  Thus, even if Plaintiffs were permitted to change their implied-in-fact contract claim at this late date, it would still fail.

### D.    There Is No Basis for Plaintiffs' Unfair Competition Claim

Plaintiffs also attempt to turn typical contract negotiations into an unfair competition claim.  Plaintiffs' claim under California Business & Professions Code §17200 is based on alleged statements by Viola or Iwanyk that they intended to enter an option agreement for *Ashes to Glory* and thought an agreement would be reached.  (*See* FAC, ¶¶25-38).  These alleged statements were made during the period when the parties were in fact attempting to negotiate an option agreement for *Ashes to Glory*.  There is no evidence that any statement was either unfair or deceptive, nor that any statement was made with any intent to deceive.  Notably, Plaintiffs' agent Jonathan Westover, who handled the negotiations, testified that he is not aware of any knowing misrepresentation by Viola or Iwanyk at any time during the negotiations.  (Sep. Stmnt. No. 52).

"The question of whether a business practice is unfair is a question of law, and may be resolved on a motion for summary judgment."  *Family Home & Fin. Ctr. v.*

*Federal Home Loan Mortgage Corp.*, 461 F.Supp.2d 1188, 1195 (C.D. Cal. 2006) (citations omitted).  An unfair business practice occurs when the practice offends an established public policy or is "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Id.*

Plaintiffs and their agent conceded the negotiations were ultimately fruitless. This does not, however, transform statements by Iwanyk or Viola that they hoped and believed that they were nearing an agreement with Plaintiffs into a deceptive practice against public policy.  Notably, Novak conceded that Viola suggested Plaintiffs hire a representative for the negotiations, foreclosing any notion that Plaintiffs relied on Defendants to conclude a deal.  (Sep. Stmnt. No. 31).  The record here is entirely devoid of evidence as to any unfair business practice by any Defendant sufficient to support Plaintiffs' unfair competition claim.

This claim fails for the additional reason that Plaintiffs are not eligible for any remedy permitted under the unfair competition statute.  Damages are not available under this statute.  *See, e.g., National Rural Telecomm. Co-op. v. DIRECTV, Inc.*, 319 F.Supp.2d 1059, 1078 (C.D. Cal. 2003).  Rather, a plaintiff can obtain *only* restitution and injunctive relief.  *See, e.g., Korea Supply Co. v. Lockheed Martin Corp.,* 29 Cal.4th 1134 (2003).  "[A]n order for restitution is one compelling a UCL defendant to return money obtained through an unfair business practice to those persons in interest from whom the property was taken, that is, to persons who had an ownership interest in the property." *Id.* at 1149 (internal punctuation and citation omitted).  Plaintiffs never gave any money or property to Defendants nor had any ownership interest in the money they are seeking and thus there is no basis for any restitution order.  (Sep. Stmnt. No. 73).  Further, injunctive relief is inappropriate because there is no evidence of any ongoing fraudulent acts or threat of future fraudulent acts to enjoin.  Plaintiffs' effort to transmute unsuccessful contract negotiations into a Section 17200 claim must be rejected.

1    **E.      There is No Basis for Plaintiffs' Copyright Infringement Claim**

2         Plaintiffs' claim for copyright infringement is also flawed.  To show copyright

3    infringement, a plaintiff must demonstrate "(1) ownership of a valid copyright, and

4    (2) copying of constituent elements of the work that are original."  *Funky Films, Inc.*

5    *v. Time Warner Entm't Co.*, 462 F.3d 1072, 1076 (9th Cir. 2006) (quoting *Feist*

6    *Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.,* 499 U.S. 340, 361 (1991)).  "The mere

7    fact that a work is copyrighted does not mean that every element of the work may be

8    protected.  Originality remains the *sine qua non* of copyright; accordingly, copyright

9    protection may extend only to those components of a work that are original to the

10   author." *Feist,* 499 U.S. at 348.

11        Copying may be shown where works are substantially similar in their

12   expression of protectable elements.  Substantial similarity contains an extrinsic and

13   intrinsic component.  *Funky Films,* 462 F.3d at 1077.  A "plaintiff who cannot

14   satisfy the extrinsic test necessarily loses on summary judgment, because a jury may

15   not find substantial similarity without evidence on both the extrinsic and intrinsic

16   tests." *Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1045 (9th Cir.

17   1994).  The Ninth Circuit has "frequently affirmed summary judgments in favor of

18   copyright defendants on the issue of substantial similarity." *Funky Films,* 462 F.3d

19   at 1077 (citation omitted).

20        The extrinsic test is objective in nature and focuses on "articulable similarities

21   between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of

22   events" in the two works. *Id.* (citation omitted).  In applying the extrinsic test, the

23   Court "compares, not the basic plot ideas for stories, but the actual concrete elements

24   that make up the total sequence of events and the relationships between the major

25   characters." *Id.* (citation omitted).

26        The Court "must take care to inquire only whether 'the *protectible elements,*

27   *standing alone,* are substantially similar.'" *Cavalier v. Random House, Inc.*, 297

28   F.3d 815, 822 (9th Cir. 2002) (citation omitted; emphasis in original).  The Court

filters out and disregards the non-protectable elements in making the substantial similarity determination. *Funky Films,* 462 F.3d at 1077.

Only *expression* of an idea, and not ideas or facts, is protected by copyright law. *See* 17 U.S.C. § 102(b). "[C]opyright protection does not extend to historical or contemporary facts, material traceable to common sources or in the public domains, and *scenes a faire*." *Chase-Riboud v. Dreamworks, Inc.*, 987 F.Supp. 1222, 1226 (C.D. Cal. 1997) (citations omitted). "To avoid a chilling effect on authors who contemplate tackling an historical issue or event, broad latitude must be granted to subsequent authors who make use of historical subject matter, including theories or plots." *Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 978 (2d Cir. 1980). "Historical facts and theories may be copied as long as the defendant does not bodily appropriate the expression of the plaintiff." *Narell v. Freeman*, 872 F.2d 907, 910-11 (9th Cir.1989). Thus, "the scope of copyright in historical accounts is narrow indeed, embracing no more than the author's original expression . . ." *Id.* at 911 (citation omitted); *see also Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1442 (9th Cir.1994).

### 1. There Is No Evidence of Copying of Protectable Elements of Plaintiffs' Work

There is no evidence that Defendants copied any protectable element of *Ashes to Glory*. *Ashes to Glory* chronicles historical facts. It is intended to be a true and accurate depiction of the historical events it covers. (Sep. Stmnt. No. 9).

*We Are Marshall* is a feature film that, while based on some of the same historical events as *Ashes to Glory*, tells the story in a very different manner by portraying real individuals mixed with fictional characters, including actual events combined with events that are altered or made up entirely for dramatic effect and using dialogue that was almost entirely created. (Sep. Stmnt. No. 13). Novak conceded that there were at least four significant characters in *We Are Marshall* that were fictitious. (*Id.*). Red Dawson, who lived through the historical events as an

assistant coach on the Marshall football team both before and after the 1970 crash and who is interviewed in *Ashes to Glory* and portrayed in *We Are Marshall*, states "there are a number of facts, events and characters that have been changed or fictionalized for dramatic effect and are not historically accurate" in *We Are Marshall.* (Sep. Stmnt. No. 13). Jack Lengyel, who took over as the head coach of the 1971 Marshall football team and who is interviewed in *Ashes to Glory* and portrayed in *We Are Marshall*, stated the same. (Sep. Stmnt. No. 13).

In fact, the two works do not even have the same focus: *We Are Marshall* is focused almost entirely on the rebuilding of the Marshall football team after the plane crash, while *Ashes to Glory* spends more than half the documentary covering Marshall football before the crash and the crash itself, getting to the rebuilding of the football team for only the last third of the documentary. (Sep. Stmnt. No. 14). Further, the issue of whether the football program will continue at Marshall after the crash is emphasized in *We Are Marshall* with fictional character Paul Griffin firmly opposing it, while in *Ashes to Glory* the question is dealt with very briefly without focus on opposition. (Sep. Stmnt. No. 82).

Expert Mark Rose's detailed declaration analyzes the plot, characters, sequence of events, setting, theme, mood, pace, and dialogue of the two works for substantial similarity. His analysis appropriately filters out consideration of the historical events and facts that underlie both works. *See Narell*, 872 F.2d at 910-11 (historical facts or events are not copyrightable). Finally, Rose examines each of the alleged similarities set forth in Plaintiffs' complaint and concludes that there is no evidence of substantial similarity between *Ashes to Glory* and *We Are Marshall*. Rose's declaration follows the framework for assessing alleged copyright infringement laid out by the Ninth Circuit (*see, e.g., Funky Films,* 462 F.3d at 1078-81) and will not be repeated here. His conclusion is amply supported.

The declarations of Red Dawson and Jack Lengyel submitted with this motion confirm the conclusion of Rose and anyone who views the two works. As the

declarations state, Dawson was an assistant coach for the Marshall football team both before and after the crash. Lengyel was the head coach of the football team for the 1971 season. Dawson and Lengyel were interviewed for *Ashes to Glory* and appeared in the documentary. Dawson and Lengyel also provided substantial first-hand information to the makers of *We Are Marshall* and were portrayed by actors in *We Are Marshall*. Based on this, and having viewed both works and lived through many of the events portrayed in them, Dawson and Lengyel declare that they do not believe the two works present the historical events in a similar manner. (Sep. Stmnt. No. 83). Rather, Dawson and Lengyel state under oath that they believe *Ashes to Glory* and *We Are Marshall* are different presentations of the historical events surrounding the Marshall plane crash. (*Id.*)

### 2. Plaintiffs Cannot Set Forth Sufficient Similarity of Protectable Expression to Show Infringement

Plaintiffs cannot point to concrete elements of original (and thus protectable) expression in *Ashes to Glory* that are substantially similar to elements of *We Are Marshall*. While the FAC contains a lengthy list of purported similarities between the works, the allegations quickly fall apart upon analysis.

The alleged similarities in the FAC are all historical facts, *scenes a faire*, mischaracterizations of the content of *We Are Marshall* and/or *Ashes to Glory* or basic ideas of the story for which no copyright protection is available.[4] Mark Rose

---

[4] Defendants have received two reports from Plaintiffs' designated expert Peter Heller upon which they expect Plaintiffs may rely in opposition to this motion. Notably, Heller identifies far fewer concrete elements that are purported to be similar between the works than the FAC does, instead relying continually on the assertion that the works have the same "narrative structure." Notably, Heller conceded he had never done a copyright infringement analysis prior to this case and that he consulted with Plaintiffs' counsel as to how to go about doing such an analysis. If relied upon by Plaintiffs, Defendants will show in their reply brief that Heller's reports are riddled with problems and wholly inadequate to create any genuine issue of material fact on the copyright or any other claim.

examines and debunks each alleged similarity in his declaration.  While Defendants will not repeat the analysis, several alleged similarities have been conceded to be historical fact by Novak or are obviously unprotectable *scenes a faire*.

- Paragraph 42.B of the FAC alleges the sequence of events from the crash to the rebuilding of the football team to the victory over Xavier is a substantial similarity.  The mere linking of historical events is not copyrightable and, in any case, the link here was made in Ernie Salvatore's article published seven years before *Ashes to Glory* was released.  (*Sep. Stmnt. Nos. 1, 3*).

- Paragraph 42.C alleges the central theme of both works is of Huntington, West Virginia and Marshall joining together.  Setting aside the fact that such a similarity would be too general to show substantial similarity, it is an inaccurate characterization of *We Are Marshall*.  There is only one character of any significance in *We Are Marshall* who is not affiliated with Marshall, that character is fictional (Paul Griffin) and does not join together with Marshall but in fact is against Marshall's efforts to rebuild the football program.  It is clear to anyone viewing the works that *We Are Marshall* is about the players and coaches on the football team, while *Ashes to Glory* focuses more on the community at large.

- Plaintiffs have conceded that the allegation in Paragraph 42.F about how the Morehouse family learned of the crash was both true and appeared in a Time magazine article prior to *Ashes to Glory*.  (*Sep. Stmnt. No. 74*).

- Paragraph 42.G, alleging that players and cheerleaders are depicted at the crash site is both a historical fact (*Sep. Stmnt. No. 75*) and a *scene a faire*.

- Paragraph 42.H alleges that Marshall player Nate Ruffin is portrayed as injured to explain why he was not on the plane, which is a historical fact. (*Sep. Stmnt. No. 76*).  Further, the injury he suffered was altered in *We Are Marshall* from calcium deposits to a dislocated shoulder to make it more dramatic.  (*Id.*)

CALDWELL
LESLIE &
PROCTOR

- Paragraphs 42.I and N regarding funeral montages being shown and law enforcement being present at the scene of the crash are both historical events or facts, and plainly *scenes a faire* in a movie about a plane crash.
- Paragraph 42.K discusses the focus on the final play of the Xavier game.  This is a historical event accurately depicted in *Ashes to Glory* but, in fact, changed in *We Are Marshall* for dramatic effect.  (Sep. Stmnt. No. 77).
- Paragraphs 42.L relating to the crowd staying at the stadium after the Xavier game is a historical fact appearing in Ernie Salvatore's article years before *Ashes to Glory* was released.  (Sep. Stmnt. No. 78).  Paragraph 42.O relating to someone yelling "get it off" just before the final play of the Xavier game, is also a historical fact and the presentation of this fact was changed in *We Are Marshall* from what actually occurred.  (Sep. Stmnt. No. 79).
- Paragraphs 42.S and X both related to kicker Blake Smith.  The allegation in Paragraph 42.S that Coach Lengyel had to tell Smith not to kick the extra point after the winning touchdown against Xavier does not actually appear in *We Are Marshall*.  (Sep. Stmnt. No. 80).  Paragraph 42.X regarding Smith's kicking a field goal during the Xavier game to give Marshall the lead at halftime is a historical fact.  (Sep. Stmnt. No. 81).
- Finally, the alleged similarities in ¶42.P, R, T, U, V and W all relate to the purported use of similar historical photographs, video footage or clips.  Even if true, Plaintiffs cannot show they have any ownership rights in any of the cited material, and therefore these allegations cannot support the infringement claim.

In *Funky Films,* the Ninth Circuit upheld the district court's grant of summary judgment in favor of producers and against screenplay creators.  462 F.3d 1072 (9th Cir. 2006).  There, both the plaintiffs' screenplay and the defendants' show were premised on a small, family run funeral home; both commenced with the unexpected death of the patriarch, not attributable to natural causes, and the return of the

CALDWELL
LESLIE &
PROCTOR

"prodigal son" who received an equal share of the business with his younger brother; both smaller funeral homes struggle against a larger competitor trying to take over the business; both include female characters who are romantically involved with the older brother; and in both stories, the older brother initially wants to sell the funeral home, but later commits himself to the business to help his brother. *Id.* at 1076-77. Despite these apparent similarities of expression rather than any historical fact, upon analyzing the two works' plot, characters, themes, setting, mood, pace, dialogue, and sequence of events, the Ninth Circuit concluded that the similarities cited by plaintiffs were not sufficiently similar to support a copyright infringement claim as a matter of law. *Id.* at 1081.

Here, Plaintiffs' case is far weaker than the plaintiffs' in *Funky Films*. When the similarities alleged by Plaintiffs are examined in light of historical fact, *scenes a faire,* and general themes and plot points that are not copyrightable, as well as inaccurate characterizations of one or both works by Plaintiffs, what is left is woefully short of what is required for a viable copyright infringement claim. No reasonable juror could find *Ashes to Glory* and *We Are Marshall* substantially similar in any protectable expression and summary judgment should be granted.

IV.   **CONCLUSION**

Based on the foregoing, Defendants respectfully request the Court grant them summary judgment.

DATED:  July 31, 2008            Respectfully submitted,

CALDWELL LESLIE & PROCTOR, PC


By _____/S/_____
ANDREW ESBENSHADE
Attorneys for Defendants

CALDWELL
LESLIE &
PROCTOR